LANHAM AND BRO. vs. CARPENTER, ET AL. 417

SYLLABUS.

UNITED STATES, for the use of JAMES C. LANHAM and CALBREITH B. LANHAM, trading as JAMES C. LANHAM AND BROTHER, *vs.* JOSEPH L. CARPENTER, JR.; and JOHN P. ALLMOND, who were sued with JOHN JACOBY.(*).

*Action of Debt on Contractor's Bond—Contract—Principal and Surety—Pleading—Evidence—Nonsuit.*

1. Rulings of the Court upon the admissibility of testimony and other questions raised during the trial of the case.

2. After considering the evidence produced by the plaintiff and the pleadings in the case, the Court granted a nonsuit.

*(June 16, 1905.)*

LORE, C. J., and GRUBB and PENNEWILL J. J., sitting.

*T. Bayard Heisel, Alex. B. Cooper* and *E. S. Douglass* (of the Washington, D. C., bar) for plaintiffs.

*J. Harvey Whiteman*, and *William B. Prentiss*, (of the Washington, D. C. bar) for defendants.

Superior Court, New Castle County, May Term, 1905.

ACTION OF DEBT (No. 43, November Term, 1901) on a Contractor's Bond.

Facts: John Jacoby entered into a contract with the District of Columbia to construct certain sewers in the City of Washington. Under the statute of the United States he was required to enter into a bond with surety for the performance of his contract for $170,000. Among other conditions in the bond, was this; that he should "promptly make payments to all persons supplying him labor and materials in the prosecution of the work provided for in such contracts." He gave as securities upon this

(*) See report of same case in 4 *Pennwill*, 487, and 5 *Pennewill*, 576.

bond Joseph L. Carpenter, Jr., and John P. Allmond, the defendants in this cause; this action being an action of debt upon that bond for the price of labor and materials furnished Jacoby by the plaintiff.

The principal in the bond died, and suit was brought against the surviving sureties, Joseph L. Carpenter, Jr., and John P. Allmond.

At the trial, the following questions were raised and ruled upon:

*Mr. Heisel*, of counsel for plaintiffs, offered in evidence a certified copy of the bond, contract and specifications of Jacoby to the United States Government, under which the work was being done.

*Mr. Whiteman:*—We object, upon the material grounds that this bond is void. The main point is this, that there being no authority requiring the execution of such a bond for the faithful performance of the contract between Mr. Jacoby and the District of Columbia, it is not competent for the authorities of the District of Columbia to appropriate the name of the United States for the making of such a bond. We contend that the statute which has been introduced into evidence, under which this suit is brought and under which they are seeking to recover, is a statute authorizing the execution of a bond where a contract is made with the United States. That being the express term, that would not authorize the District of Columbia as a separate and distinct municipal corporation to execute a bond in the name of the United States. The point, briefly expressed, is this: that the statute introduced does not apply to the District of Columbia, and therefore not applicable to this suit.

PENNEWILL, J.:—Is it not your contention that the bond in question is not authorized by the statute?

*Mr. Whiteman:*—Exactly so, because this work was not done for the United States, but for the District of Columbia.

*Mr. Prentiss:*—Under the organic act organizing the District of Columbia, the District is authorized to take such bonds in the

## LANHAM AND BRO. vs. CARPENTER, et al.    419

EVIDENCE—OPINION.

name of the United States.  Our contention is that this is a statutory remedy applicable to contracts with the United States and not to contracts with the District of Columbia, and therefore the inclusion of this additional condition in the bond is not supported by the statute, and cannot support an action based upon the statute.

(After a protracted discussion of the above points and the citation of numerous authorities by the respective counsel, the Court rendered the following opinion:)

PENNEWILL, J.:—This is a very important question, and we have had but a very short time in which to consider it.  It is manifestly vital.  We do not feel that we ought to exclude this testimony at this stage of the case.  What our opinion may be if we shall charge the jury, or at a later stage of the case, we cannot now state.  That will be a matter for argument later.

Is there any other ground of objection?

*Mr. Prentiss:*—We have a further objection to the introduction of this contract in evidence, namely, upon the ground that the Act of Congress passed since the suit was instituted has now taken jurisdiction from every tribunal except the Circuit Court for the District of Columbia where the work was to be performed.

PENNEWILL, J.:—The Court think the evidence offered cannot be excluded upon this ground, and we admit it, subject to further consideration in the later stages of the case.

*Calbreith B. Lanham*, one of the plaintiffs, testified in part as follows:

*By Mr. Heisel:*

Q.  What relation is James C. Lanham to you, if any?

A.  A brother.

Q.  Did you have any business relations with him in 1901?

A.  Yes sir.

Q.  Will you state what those business relations were?

A.  We were partners, building a tunnel for John Jacoby in the District of Columbia.

Q.  Under what name were you trading?

A.  James C. Lanham and Brother.

EVIDENCE—OPINION.

Q. Were you acquainted with the work that Mr. Jacoby was doing there?

A. Yes sir.

Q. What was that work?

A. He was building a sewer called the East Side Intercepting sewer.

Q. Were you familiar with the contract that Mr. Jacoby had with the United States Government for doing certain sewer work in Washington?

A. I was more or less familiar with it. I rode over it with him numerous times.

Q. Was this work that you were doing, in pursuance of the contract that Mr. Jacoby had with the District of Columbia?

A. A portion of it.

Q. What was the work that you were doing?

A. We drove a tunnel and two shafts for the same.

Q. There is in evidence here a modification of the contract between Mr. Jacoby and the District of Columbia that says: "That the specification of said contracts, in so far as they require the excavation of a trench for said sewer from a point near the intersection of Eighth and M Streets S. E. eastward to fourteenth and M Streets S. E., shall be so modified as to permit the said John Jacoby to excavate a tunnel between said points instead of excavating an open trench and constructing therein a portion of said sewer," etc. Was or was not the tunnel which you say you were digging for Mr. Jacoby within the points named in what I have read to you here?

(Objected to by Mr. Whiteman, who states that he will ask the witness if the work he did in relation to the above question was done in pursuance of a written contract between his fiim and Mr. Jacoby. Mr. Heisel objects to Mr. Whiteman's asking such a question as proposed at this stage of the case).

PENNEWILL, J.:—A majority of the Court think the question asked the witness by Mr. Heisel is admissible. How far you will be permitted to go is another question. We think the proposed question of Mr. Whiteman is not admissible at this time.

LANHAM AND BRO. vs. CARPENTER, et al. 421

EVIDENCE.

*Mr. Whiteman:*—My specific objection to the question last asked the witness by Mr. Heisel is, that what was done was done pursuant to a written contract between the use plaintiffs and Mr. Jacoby; and I note an exception to the ruling of the Court on the ground that the writing itself is the best evidence.

Pennewill, J.:—A majority of the Court think the question is admissible.

Q. (*By Mr. Heisel*) Do you understand the question, Mr. Lanham?

A. Yes sir.

Q. Please answer it.

A. Yes sir.

Q. That is, the work was done under the modification between those points?

A. Yes sir.

Q. You furnished Mr. Jacoby with all materials that were used, and labor, in the prosecution of that work between those points?

(Objected to by Mr. Whiteman, of counsel for defendants, on the ground that the witness was asked to speak of the contents of a written paper, and that the paper itself was the best evidence.)

Pennewill, J.:—A majority of the Court think this question is admissible.

A. Yes sir.

Q. Was that in pursuance to a written or an oral contract?

A. A written contract.

*Mr. Heisel* (handing paper to witness):—It has been agreed between counsel for the defendants and myself that this copy of the contract between Mr. Lanham and his brother, trading as Lanham and Brother, and Mr. Jacoby, shall be admitted in evidence. A memorandum upon it says: "Compared and approved by Whiteman and Heisel to be admitted in evidence under agreement."

Pennewill, J.:—Then there is no objection?

*Mr. Whiteman:*—There is this; Mr. Heisel and I have some agreements, and we admit that those shall be received as a copy of

the contract and that the matter of formal proof of its execution is admitted. On the other hand, Mr. Heisel admits that a certain suit in the Supreme Court of the District of Columbia by these same plaintiffs, Lanham and Brother, upon this same contract, and that in that case the Court had jurisdiction to hear and determine all matters in controversy arising out of this contract and also had jurisdiction of the parties, and that the Jacoby named in the present suit is the same Jacoby as named in the suit referred to in the Supreme Court at Washington.

*Mr. Heisel:*—I think that is correct.

PENNEWILL, J.:—Is it in writing?

*Mr. Whiteman:*—No sir; it is merely a memorandum.

*Mr. Heisel:*—The whole agreement was this; that instead of obliging us to call the attesting witnesses to prove this, it would be put in under the agreement referred to.

PENNEWILL, J.:—The reasons are immaterial—do you agree that it shall be admitted?

*Mr. Whiteman:*—I do.

PENNEWILL, J.:—It is admitted in evidence.

(The same is marked by the Stenographer "Plaintiffs' Exhibit No. 3").

(Mr. Heisel here reads said Plaintiffs' Exhibit No. 3 to the jury).

(Mr. Whiteman here begins to read the memorandum agreement made between himself and Mr. Heisel, to which Mr. Cooper, of counsel for plaintiffs, objects).

PENNEWILL, J.:—Is there any reason why these papers should be admitted simultaneously?

*Mr. Cooper:*—No sir.

*Mr. Whiteman:*—I only want to protect myself as to my proof.

*Mr. Heisel:*—The agreement is simply this; that when he comes to prove certain things in his defense, I am ready to admit them.

PENNEWILL, J.:—Have you agreed that it is to be admitted at the present time?

LANHAM AND BRO. vs. CARPENTER, et al.   423

EVIDENCE.

*Mr. Heisel:*—Yes sir; at the proper time.

PENNEWILL, J.:—Suppose you read the memorandum.

*Mr. Whiteman:*—It is as follows: "It is admitted that the Supreme Court of the District of Columbia is a Court of General jurisdiction and competent to hear and determine the matters in controversy in the said cause tried in the said Court and the matters in controversy in this case; that this cause was instituted in said Supreme Court; that the Court of Appeals of the District of Columbia is a Court of competent appellate jurisdiction to review and revise the judicial actions of said Supreme Court."

PENNEWILL, J.:—Do you agree to that?

*Mr. Heisel:*—That is the agreement I had with Mr. Whiteman, which was to be put in when he put in his case.

PENNEWILL, J.:—It is not put in now, but he simply identifies it.

Q.   (By Mr. Heisel) How many linear feet of tunnel excavations were made by you and your brother for Mr. Jacoby under the terms of this contract—speak of your own knowledge?

A.   Six hundred and four (604) feet.

Q.   How do you know?

A.   Because I walked it and measured it and looked at it a number of times and I ought to know.

Q.   How did you measure it?

A.   By merely pacing it lots of times, and the last and final time with a tape line made of steel—me at one end and another man at the other.

Q.   And you say there were 604 feet?

A.   Yes sir; and maybe more, but that I am positive of.

Q.   And that was done under this contract at the place mentioned in the contract between Mr. Jacoby and the District of Columbia, the tunnel work under his contract?

A.   Yes sir.

Q.   What other excavation was there that you did under this contract—did you dig the shafting?

(Objected to by Mr. Prentiss, of counsel for defendants, as irrelevant, because, as he contended, it would appear that the

contract between Jacoby and the District of Columbia did not contemplate any shafting and therefore it was not within the purview of the obligation assumed by the sureties; and furthermore, even if the modification of the contract permits tunneling, it does not provide for any shafting. The modification merely was that between certain points there was to be a tunnel instead of an opening or cut. When he reached that point with his cut, he could have gone right straight on with his tunnel. It was not necessary to go up to the surface at different points and drive shafts to meet the middle of the tunnel. That was done more as a matter of convenience and economy between Jacoby and Lanham and Brother, because the work might have been done a little more cheaply that way; the sureties however, are to stick to the letter of the contract, and that does not provide for any shafting.

PENNEWILL, J.:—Your objection, Mr. Prentiss, is that it was not necessary, in order to construct the sewer, that the shafts should be dug?

*Mr. Prentiss:*—Yes sir.

PENNEWILL, J.:—And you, Mr. Heisel, contend that it was necessary?

*Mr. Heisel:*—Yes sir.

PENNEWILL, J.: Is not that a matter for the jury?

*Mr. Prentiss:* No sir; the sureties did not consent either by letter or necessarily by the spirit of this amendment that they should be held liable for the cost of digging shafts for the convenience of the contractor or sub-contractor.

PENNEWILL, J.:—But it is a question whether the shafting was a necessary work to be done in order to accomplish the digging of the tunnel.

*Mr. Prentiss:*—I would like to read to the Court the modification of the contract. (Mr. Prentiss here reads the paper in question.)

PENNEWILL, J.:—Suppose the jury should believe that in order to do the tunneling, it was reasonably necessary that the shafting should be done. I don't say that it was necessary, how can the Court determine that?

*Mr. Prentiss:*—The sureties are not to be bound beyond the strict letter of their obligation.

PENNEWILL, J.:—We do not see how we can determine that now.   We think this question is admissible.

A.  Yes sir.

Q.  How many cubic yards of shafting?

A.  Three hundred and ninety, (390).

Q.  And that labor was performed under the conditions of this contract and for the purpose of carrying out the contract which Mr. Jacoby had made with the District of Columbia.

A.  Yes sir.

*Mr. Prentiss:*—I move to have the answer stricken out.   The question should be whether it was done under Lanham and Brother's contract with Jacoby.   The contract itself is evidence of that.

PENNEWILL, J.:—We think the answer is an opinion, and that it should be stricken out.

Q.  That labor was performed under the conditions of this contract between you and Mr. Jacoby?

A.  Yes sir.

Q.  In compliance with these terms?

A.  Yes sir.

*Mr. Prentiss:*—We object for the same reasons, and ask that the above answers be stricken out.

PENNEWILL, J.:—It is an opinion of the witness whether the work that he did came under the contract or not.   We think that ought to be stricken out, and so order.

Q.  Was, or was not the work about which you have just been speaking—both the tunnel and shaft excavations—performed between a point at or near the intersection of Eighth and M streets, North East.

(Objected to by Mr. Whiteman as leading.)

PENNEWILL, J.:—Suppose you ask him where it was done.

Q.  Where was it done?

A.  I cannot remember the number of streets there were, but it was about the point you have just mentioned; that point,

to the best of my recollection, being opposite the front of the Navy Yard main entrance running this way (indicating) across certain steeets whose names you just mentioned a moment ago.

Q.   Did you furnish any materials under this contract with Mr. Jacoby that were used in the prosecution of that work?

A.   Yes sir.

(Objected to by counsel for defendant and motion made to strike out, on two grounds: first, that the answer was immaterial and second, that it was not a matter which the sureties undertook to guarantee; that lumber was excluded from the contract as a constituent part or element entering into the things to be constructed.

PENNEWILL, J.:—We think the testimony is admissible, and refuse to strike out the answer.

Q.   What kind of lumber was it that was used?

(Objected to by counsel for defendant on the same grounds as stated to the last question.)

PENNEWILL, J.:—We overrule the objection and admit the testimony.

A.   Posts.

Q.   What other kind?

A.   Boards or plank.

Q.   How many feet of posts, board measure, did you supply in this work?

(Objected to by Mr. Prentiss, counsel for defendants, on the ground that the witness had not been qualified to speak upon the subject matter inquired about; it not having been shown that he was in charge of the operation there.)

.  PENNEWILL, J.:—Necessarily, you must speak of your own knowledge.   Mr. Heisel, you may ask him whether he knows of his own knowledge.

Q.   Do you know, of your own knowledge, how many feet of lumber, board measure, there was in those posts?

A.   Yes sir.

Q.   How many feet?

A.   Twelve thousand (12,000) feet.

LANHAM AND BRO. vs. CARPENTER, ET AL.    427

EVIDENCE—OPINION.

Q. Do you know how many feet of lumber, board measure, there were in the planks and other lumber or timber used in those tunnels?

A. Yes sir.

Q. How many feet were there?

A. Seventy-four thousand (74,000) that I know of, and possibly more.

Q. And that was in planking and other lumber, other than posts, was it?

A. That is right.

Q. Was the timber about which you have just spoken left in the tunnel that you were driving in Washington under this contract you spoke ot yesterday?

(Objected to by Mr. Prentiss, of counsel for defendants, on the ground that the witness had not been qualified to speak.)

PENNEWILL, J.:—You can cross-examine as to his knowledge. If he knows, he can speak. We think the question is admissible.

A. Yes sir.

Q. Were you directed by anyone to leave that lumber in the tunnel.

*Mr. Prentiss:*—We object to that as not the best evidence. An official order of the District of Columbia or any of its officers is entered on the records of the District of Columbia. The purpose of the provision in the bond contract and the only purpose of the order presented with it would be to bind the District to liability to pay for such lumber and such liability can be shown only by an official act and that must be done in an official manner and become a matter of record of the District of Columbia and that record is the best evidence of any order of that kind. A mere verbal suggestion to leave that in would not be binding upon the District. There must be an official act to bind the District of Columbia entered in the record of the District.

PENNEWILL, J.:—Is there any evidence here requiring an official record?

*Mr. Prentiss:*—Only in the provisions of the contract.

PENNEWILL, J.:—Is there anything in the contract requiring an official record?

*Mr. Prentiss:*—The contract says that no lumber left in the trench is to be paid for except specifically ordered or directed by the engineer to be left in the trench.

PENNEWILL, J.:—We think this question is admissible.

(At the request of counsel for plaintiff, the stenographer reads the question last asked, and objected to, to the witness.)

A.   Yes sir.

Q.   Who directed you to leave it in there?

A.   The government inspectors and engineers.

Q.   What government inspectors and engineers?

A.   For the District of Columbia.

A.   Of what work were they in charge—were they in charge of this work?

A.   They were in charge of Jacoby's work that we were doing.

Q.   That you were doing there?

A.   Yes sir.

Q.   Were you specifically directed by that engineer and inspector to do that prior to the refilling of the trench.

(Objected to by counsel for defendants as leading.   Objection sustained.)

Q.   When, if you can recall it, were you specifically directed by the engineer in charge of the work to leave those timbers and materials about which you have been talking, in the tunnel?

A.   As to the date, I don't know, but it was just shortly after the beginning of the tunnel proper under the contract. That was by the inspector; and a few days following that by the engineer in charge of the work.

Q.   What did he say in directing you to leave it in there?

A.   The engineer, do you mean?

Q.   Yes.

A.   I asked him what his orders were going to be in regard to it; that I had had instructions from his inspectors, but that I would prefer to know what he would say to me as a sub-contrac-

tor under Mr. Jacoby—had he issued or would he issue· orders to that effect, and what should I do; and he said, "You have to leave them in there; you must leave them in there."

Q.   Was it possible for you to have gotten them out?

A.   Not physically—not practically—possible.   You might have opened the ground from there after the masonry was completed to the street above and taken them out.

Q.   About how deep was the top of the tunnel from the surface of the street above—that is, what was the amount of dirt above the top of the tunnel to the surface of the street?

A.   That would run from forty-two to sixty feet.

Q.   You were down in the tunnel while it was being driven or dug?

A.   Yes sir.

Q.ˈ What was the condition of the ground through which you were digging that tunnel as to hardness or softness? as to caving or stability after it was dug?

(Objected to by Mr. Prentiss, of counsel for defendants, on the ground that the witness had not been qualified to answer such an expert question.)

PENNEWILL, J.:—We think he can tell the condition of the ground.

A.   It was soft ground.

Q.   For what purpose were these posts and lumber about, which you have been testifying, used by you in that tunnel?

A.   It was put there to support this tremendous weight of ground until the masonry could be put in place.

Q.   Could you have driven this tunnel from the point where you started to drive it on towards the way you did drive it, by driving in the side and not going down in the shaft?

Mr. Prentiss:—The bond of the sureties does not provide that anything shall be done more than tunneling.   It does not provide when or how it shall be done.   We object to any evidence as to relations between Lanham and Brother and Jacoby, because the surety was not a party to that contract, and the sureties' liabilities must be tested by the contract they entered into and

the terms of that contract and the specifications as modified by the agreement.

PENNEWILL, J.:—They did consent that it might be done by tunneling.

*Mr. Heisel:*—We propose to show there was no other way of doing it by tunneling excepting by sinking the shafts for the reason that the sewer was all built up to that point and they could not drive in any other way and it was necessary to sink the shafts.

PENNEWILL, J.:—Your purpose is to show that the only way to drive the tunnel was to do the work the way you are now inquiring about?

*Mr. Heisel:*—Yes sir; the only way was to drive the shafts, such being necessary in the prosecution of the work contracted for by Jacoby with the District of Columbia, and that the Court passed upon.

*Mr. Prentiss:*—We object to that also as a matter of opinion.

*Mr. Heisel:*—We claim it is not a matter of opinion.

PENNEWILL, J.:—It seems to us that the modification of the contract being that this particular work might be done by tunneling; if that means all that was reasonably necessary in order to do the tunneling, you can show the physical condition leading up to that.

Q. Will you please state the physical condition of the street under which this tunnel was being driven from the point where the tunnel was begun to the point where it was finished.

(Objected to by counsel for defendants, on the same grounds as last above stated.)

PENNEWILL, J.:—The objection is overruled.  We admit the question.

A. The sewer had been driven to this point where the hill was too heavy—

(The further answer of the witness is here interrupted with an objection by Mr. Prentiss, counsel for defendants, on the ground thnt the witness was giving his reasons, which amounted to an opinion.)

PENNEWILL, J.:—The objection is overruled.

*Mr. Heisel* (Addressing the witness):—Now go on with your answer, please.

A.   The tunnel had been made by open trench up to the beginning, or supposed beginning of the proposed tunnel, for the reason that the ground was too deep or too much to be opened up to the surface and therefore the tunnel being completed to that point, there was no possible means of ingress or egress to that end of the work because the sewer was completed to that point, leaving about a six foot opening—something like that—and a two-mile haul to get out, whatever you might take out from the tunnel?

Q.   There was a six-foot opening to get through the sewer and a two mile haul to take the bed out.

A.   Yes sir.   On the other end of the tunnel there was some more ground that was not so heavy as that proposed to be done by tunneling.   That had been opened up and completed and was filled with water left in there.

Q.   You could not go that way?

A.   We could not go that way.

Q.   What did you do, in order to drive that tunnel?

A.   I sunk two shafts.

Q.   For what purpose or purposes were those shafts sunk?

A.   So that we could begin the tunnel from the bottom of those shafts.

Q.   Explain to the Court and the jury how those shafts were used by you in driving that tunnel.

A.   The shaft is similar to any hole or well in the ground. It is dug to a certain depth, to meet the point of the trench at which the sewer should be laid and on reaching the bottom of the shaft we then tunnel in each direction striking bottom on the lines given by stakes and plans of the engineers.

Q.   What did you do with the dirt that you dug out of the tunnel?

A.   We hauled it away.

Q.   How did you get it to the surface of the ground?

A.   We hauled it up by hoisting engines and apparatus up to the top of the shafts and through the shafts.

Q.   And hauled it away?

A.   Yes sir.

Q.   What did you do with it when you hauled it away?

A.   Dumped it down on the water's edge to fill in.

Q.   Were you directed to dump it there?

(Objected to by counsel for defendants as immaterial.)

PENNEWILL, J.:—We think it is immaterial.

Q.   Is that sewer used by the District of Columbia now?

(Objected to by counsel for defendants as immaterial.)

PENNEWILL, J.:—How is that pertinent?

*Mr. Heisel:*—Only in this way: that this man did work as a contractor on this sewer, and we want to show that the sewer was accepted by the District of Columbia and that the District is now using the sewer which was constructed under this contract.   The contract on his part is thereby completed.

PENNEWILL, J.:—If it was accepted, whether it was used or not would be perfectly immaterial to this case.

Q.   In doing this work, who directed you as to what you were to do in the way of lines and depth—under whose supervision was it done?

A.   Under the engineer of the District of Columbia.

Q.   Up until the time that you ceased to work, was it done to the satisfaction of the engineers of the District of Columbia?

A.   It was accepted every day, in fact.

Q.   The contract of Mr. Jacoby with the District of Columbia was made on the thirteenth day of October, 1899.   Was it after that time that you furnished the material and labor, which you are now seeking to recover for, to Mr. Jacoby?

A.   O, Yes sir.

Q.   Your contract with Mr. Jacoby, which is now in evidence is dated the twenty-seventh day of November, A. D. 1900. Was it after that that you supplied the material and labor spoken of in the prosecution of this work?

A.   Yes sir.

Q.   Under your contract with Mr. Jacoby in reference to this work, you were to complete your work by the first day of September. Did you do that?

A. · No sir.

Q.   I mean by that, the whole job from one point to another between which the tunnel was to be driven.

A.   No sir; I never completed it.

Q.   Why did not you complete it?

A.   Because John Jacoby and his agents took it away from me.

Q.   You mean by that, that they discharged you?

A.   Virtually so, yes sir.   They took possession.

Q.   They refused to let you proceed with the work.

A.   Yes sir.

Q.   About when was that?

A.   Along in June.

Q.   Of what year?

A.   The year nineteen hundred and one.

Q.   Do you remember just the day.

A.   I think it was the eighth, or pretty close to it.

*Mr. Prentiss:*—What day of the week?

*Mr. Heisel:*—You can bring that out on cross-examination.

A.   (Witness continues):   He took it from us on the eighth or he began it on the eighth; one or the other.

Q.   What is the balance now due you from Mr. Jacoby for furnishing the labor and materials that you have testified to in this case?

(Objected to by Mr. Prentiss, of counsel for defendants, on the ground that the question calls for a conclusion from a good deal of figuring, and the elements of the figuring, rather than the conclusion, ought to be presented to the jury.)

PENNEWILL, J.:—That is all a matter of cross-examination. He can state what his claim is.   The objection is overruled.

A.   Three thousand four hundred and seventy-eight dollars and some cents ($3478.); I have forgotten the fractional cents.

Q.   Does that include interest on your claim?

A.   Yes sir.

Q.   From what time do you claim interest?

A.   From July first, 1901.

Q.   What was the amount due you on July first, 1901, for the labor and material furnished by you to Mr. Jacoby in the prosecution of this work?

(Objected to by Mr. Prentiss, of counsel for defendants, on the same ground as before stated to a similar question.)

PENNEWILL, J.:—The objection is overruled.

A.   Two thousand eight hundred and sixteen dollars ($2816) and some cents.

Q.   Is that allowing Mr. Jacoby credit for all amounts that he paid you on account of labor and material in the prosecution of this work?

(Objected to by counsel for defendants, on the ground that the proper way to get at that would be to have those separate items stated.)

PENNEWILL, J.:—We think it is admissible.

A.   That is, yes sir.

Q.   What is your business?

A.   Contractors' machinery, earth and stone moving machinery, and some contracting business—or sub-contracting business either.

Q.   Had you ever had a contract for the digging of a tunnel before this one?

A.   Yes sir.

Q.   How often had you done it?

A.   That stretches over a period of a good many years; how often—I would say I have done, big and little tunnels together, eight or nine years; not as a contractor, however, but as an employee of a contractor.

Q.   Do you make a specialty of any earth or stone moving machinery in your business?

A.   Yes sir.

Q:   What?

LANHAM AND BRO. vs. CARPENTER, ET AL.   435

EVIDENCE—OPINION.

(Objected to by counsel for defendant as immaterial and irrelevant.)

*Mr. Heisel:*—My purpose is to qualify this witness as an expert on tunnels, to give his opinion as to the proper way of driving this tunnel at Washington, for the purpose of showing that the lumber and materials were necessary in his opinion as an expert and that the shafts were necessary also in his opinion as an expert.

PENNEWILL, J.:—As to what machinery is necessary in the construction of tunnels?

*Mr. Heisel:*—Yes sir; it being his business to be up on tunnel work.

PENNEWILL, J.:—This is simply to qualify him as an expert. The witness may answer the question.

A.   Grading apparatus, hoisting apparatus, cars for tunnels; air compressor plants, and drilling apparatus for rock.

Q.   Used in the cutting of tunnels?

A.   Yes sir.

Q.   Was it necessary in driving the tunnel where you did drive it, to sink shafts before driving the tunnel?

(Objected to by counsel for defendant, on the ground that the witness has not been properly qualified to answer the question.)

PENNEWILL, J.:—We think, Mr. Heisel, that you ought to show that his employment and experience have had something to do with the actual construction of tunnels.

Q.   Were you employed on such work on these various jobs?

A.   Yes sir.

Q.   Please state what such employment covered.

A.   Well, it commenced back as water boy and comes right up to Superintendent in some of the largest tunnels in this country,—as Superintendent and as sub-contractor.

Q.   From water boy up to Superintendent?

A.   Yes sir.

Q.   I will now ask you this question: Was it necessary, in

driving the tunnel where you did drive it, to sink shafts before driving the tunnel?

(Objected to by counsel for defendants on the same ground as before stated to the same question).

PENNEWILL, J.:—We think he is qualified to answer that question.

A. There is no way on earth to get through the tunnel without the shaft first.

Q. Then was it or not necessary to drive the shaft first?

A. It certainly was.

Q. Was it or not necessary to use the lumber, timber and posts about which you have testified here in the construction of that tunnel?

A. They had to be used. It certainly was necessary.

Q. Why did they have to be used?

A. Because the ground would not stand alone.

Q. What do you mean by that?

A. That it would not stand without substantial support.

Q. Stand for what time?

A. For the time required to put the masonry in the tunnel excavation.

Q. From what time to what time?

A. From the time it took to make the opening until the time required to put the masonry in, which would take say from one day to two days.

Q. Those timbers you say were necessary to keep the earth from falling before they got the concrete or brick work in?

A. Yes sir.

Q. After the hole was driven and the timbers were put in, where did the lumber or boards go, in what part of the tunnel?

(Objected to by counsel for defendants as leading and also on the same general ground as before stated.)

PENNEWILL, J.:—The objection is overruled. We admit the question.

A. That goes on the top and portions of the sides—the roof and part of the walls, so to speak.

Q.   After that was put in, what was done then?

A.   The masonry was placed in under it.

Q.   And then where were the timbers after the masonry was put in?

A.   Directly over the top of the masonry wedged with it.

Q.   And underneath of what?

A.   Underneath of the ground above.

Q.   Underneath the top of it and the surface of the street above?

A.   That is the idea.

Q.   You said it was all done under the general supervision of the engineer in charge?

A.   I did; daily.

*Mr. Heisel:*—We are through with the re-direct examination. This is now recall.

Q.   Did you ever have a conversation with Mr. Jacoby about the amount of lumber that he owed you for in this tunnel?

A.   Yes sir.

Q.   Where did you have that conversation?

A,   At the works and at the hotel.

Q.   Did you tell him how many feet of lumber were in that tunnel?

(Objected to by Mr. Whiteman, of counsel for defendants, on the ground that the suit having been brought against Mr. Jacoby and the sureties in the bond, and the witness being one of the plaintiffs in said suit, any testimony that he might give, as to conversations with Mr. Jacoby, who was dead, was contrary to the terms and spirit of the statute which provides that in actions or proceedings by or against executors, administrators or guardians in which judgment or decree may be rendered for or against them, neither party shall be allowed to testify against the other as to any transactions with or statements of the testator, etc.)

PENNEWILL, J.:—The statute does not cover this case.

*Mr. Whiteman:*—This being a suit against sureties, any statement by Mr. Jacoby when he is not the party declared against, is hearsay testimony.

PENNEWILL,  J.:—What  time  are  you  inquiring  about,
Mr Heisel?

*Mr. Heisel*   (Addressing witness):—Was it during the pro-
gress of the work or after the completion of the work that you had
this  conversation  with  Mr.  Jacoby?

A.   Both  times.

PENNEWILL,  J.:—We think you will have to confine this to
conversations or admissions made by Mr. Jacoby to the plaintiff
during the prosecution of the work, and not after it, this being
a suit against the  sureties.

(Question  withdrawn.)

Q.   Where is Mr. Wren, now, if you know?

A.   I don't know for the moment.

## MOTION FOR NONSUIT.

*Mr. Prentiss:*—If the Court please, we now move for a non-
suit.   The declaration is fatally defective, in that it does not pre-
sent  all  the  elements  which  constitute  the  plaintiff's  right  of
action.   The breaches averred being an allegation in the language
of the statute and such elements ought to be averred and proven.

The averment that the material was furnished under some
contract is insufficient; unless the contract is particularly set out;
the material might have been given to the contractor.

The declaration should show whether or not there was an
express contract for furnishing these materials, and if not, the
fact should be so stated that the implied contract may be evolved
from  the  allegation.

LORE, C. J.:—Has there been any demurrer, either special or
general,  filed to this declaration?

*Mr. Prentiss:*—Not to this particular one.   There was to a
former one.

LORE, C. J.:—How can that be a ground for a nonsuit?

*Mr. Prentiss:*—I understand that at common law anything
good on demurrer to the declaration is good any time before
verdict  or  after  verdict.

LANHAM AND BRO. vs. CARPENTER, et al.    439

ARGUMENTS.

Lore, C. J.:—You have waived lack of precision in the declaration by failure to demur.

*Mr. Prentiss:*—The points I make are these:

*First.* That the plaintiffs do not allege that this material was furnished under any contract with Jacoby. They merely use the language of the statute, that in the prosecution of the work at certain times they did supply to John Jacoby a large amount of both labor and materials, setting them out.

A contract cannot be implied unless it is shown that there was no written contract and they do not say that Jacoby undertook to pay the price they have alleged in their declaration,

*Second.* That the bond is not the statutory bond. The statute of 1894 authorizes such a bond in connection with the District, if there is a formal contract with the United States. The District is a separate corporation, a separate entity from the United States, and a contract with the District is not a contract with the United States, a different corporation.

*Third.* If the Act of 1894 does not apply to this bond, can this suit be maintained upon common law principles? We contend not.

The provision that the contractor shall make payment promptly to material men is confined to the right of the District of Columbia to recover from Jacoby and the sureties the amount of such damage; but when we go to a third party who says he is a material man who has furnished material and wants to sue upon the bond, it does not apply to such sub-contractor who does part of the work. It applies to those who furnish material and labor contracts; not sub-contractors. So it does not protect sub-contractors like Lanham and Brother; although they claim they furnished material, it was not material within the meaning of the Act, and they are not protected by the statute.

(The whole of the afternoon session of Court was taken up with the argument of the respective counsel upon the motion for a nonsuit and the citation of authorities.)

(The following day, after hearing further argument upon the motion for a nonsuit, the Court rendered the following decision):

PENNEWILL, J.:—The Court think the question raised by the motion for a nonsuit in this case is an exceedingly important one; and while further argument upon the point may not be necessary, we prefer to determine this question when we come to charge the jury. You can very properly raise the question in your prayers.

The nonsuit is refused.

*Mr. Whiteman:*—That puts us under the necessity of arguing one point, which we think is a very important one, which has not been touched upon as yet. I cannot say how soon it will arise. I cannot anticipate what my learned friends will do. The point we have to argue is as to the effect of the judgment in the District of Columbia upon this suit.

I offer in evidence a certified transcript or exemplification, under the Act of Congress (the regularity of the certification or exemplification being admitted by the other side) of the record, in the Supreme Court of the District of Columbia, of the case of James C. Lanham and Calbreith B. Lanham, partners doing business under the firm name of James C. Lanham and Brother, plaintiffs, *vs.* John Jacoby, defendant; at law, 44763.

*Mr. Cooper:*—We object to the admission in evidence of this record. The plea of former recovery filed in this case is a plea in *bar* to the action and not by way of *estoppel*, which should set forth the particular question heretofore determined. The plea is general that all matters were determined. *Freeman on Judgment, Sec.* 247 and text books. This plea in legal effect says, that judgment has been heretofore recovered before a court of competent jurisdiction, in a case between the *same* parties and for the *identical cause of action*, as in this suit. If this were so we could make no objection. This record shows the contrary.

But we submit, *first*, that the parties to this action were neither parties nor privies to the former action.

*Second*, That the cause of action and questions decided were entirely different from those involved in this suit, and on a different undertaking. Let us now examine the character of each of the two suits.

(1) Jacoby had entered into a contract with the District of

Columbia to build certain sewers in the City of Washington.   He gave a bond in the penal sum of $170,000.00 with these defendants as sureties for the performance of his contract and also under the United States statute of 1894) conditioned to "promptly pay all persons supplying him with labor and materials in the prosecution of his work."   He sub-contracted, by written contract, with the plaintiffs for them to make the tunnel and shaft excavations of earth.   This was a personal contract between them with which these sureties had nothing to do.   There were distinct covenants in the contract, Jacoby to perform some and these plaintiffs others.

A suit was brought by these plaintiffs against Jacoby for the breach of *his* covenants in not furnishing engines, lagging, and preventing plaintiffs from continuing work, and for unliquidated damages.   The record shows a recovery against him by plaintiffs for that breach, and that breach was the only one assigned in the narr and pleaded to,—in fact that was the *only* issue in the case. So much for that case.   See Record and plea.

(2)   This is an action on a bond given to the United States, by Jacoby and these defendants as sureties and against the sureties, to recover the money due the plaintiffs for labor and material supplied by them, by reason of the breach by Jacoby of the condition of the bond "to promptly pay all persons" etc.   The sureties were neither parties nor privies to the suit in Washington in *fact* or in *law*.

(a)   That suit was between Lanham and Bro. and Jacoby; this suit between Lanham and Bro. and Carpenter and Allmond.

(b)   The sureties could not have been made parties in a suit on that contract, they were not sureties for its performance, nor privies to it.   They had nothing to do with it.

Again, *former judgments*, to operate as a *bar* to another suit, even between the same parties, must be mutual and binding on both parties to bring them within the rule of jurisdiction.   Either party can plead it.

2 *Smith L. C.*, 658 *and* 787; 1 *Herman Es.* 172, 173; *Burton vs. Hazard*, 4 *Harrington* 100.

Suppose the verdict had been in favor of Jacoby on the issue joined, that is, that he did not break that part of his contract; could it conclude plaintiffs from suing and recovering for the price of the labor and material supplied to Jacoby? Certainly not; and if not, it does not mutually bind both. Nor could it if Jacoby had brought the suit and recovered.

The same identical question or cause of action must have been determined in the former suit. But the record discloses that they were entirely different. The former suit was on a contract with Jacoby. This suit is on a bond to secure the performance of an entirely different contract.

The declaration and pleas show precisely the question involved in the former suit,—Breach of Jacoby's covenants alone. The question of Jacoby's indebtedness to the plaintiff for the work and material supplied was not involved and could not be under the pleadings. The court so decided, and in legal effect said, the plaintiffs can only recover for the breaches alleged, treating it as a divisible contract.

Even if the amount had been ascertained and *paid*, if not paid promptly, we could still recover damages for its *not having been promptly paid*. This is the condition in bond. The fact that he did not pay at all, only increases the amount of our claim or his liability under the statute which authorizes us to sue for it. Is not this a very material and distinct issue from that involved in the former suit? It is very clear to me and would work gross injustice to plaintiffs if it was not so. The plaintiffs had *three* distinct remedies for the money due them, any of which they could have selected.

## LAW.

To admit this record it must be shown by the record itself, (or if it does not disclose it, by oral testimony) that the parties, and that the Cause of action in former suit were identical to those in this case. That the very question (the material question) involved in this case, was determined in the other. That is, that

the same evidence was necessary in each case.   This is the test
and I will show it.   This has been universally held from the
Duchess of Kingston's case (*Howell's St. Trials*) down to the
present time.

I will first cite all the cases upon the general subject in our
own reports, without regard to any particular point.

*Hollis vs. Morris*, 2 *Harr.* 128;   *Hazzard vs. Burton*, 4 *Harr.*
100; *Poor vs. Darrah*, 5 *Houston*, 394; *Cann vs. Warner*, 1 *Houst·*
189; *Worknot vs. Millen*, 1 *Harr.* 139;   *Stephens vs. Gray*, 2 *Harr.*
348; *Duchess of Kingston's case* (*notes*) 2 *Smith L. C.* (*top*) 791,
792, 798, 787, 813, 808, 810, 812; 1 *Herman on Es. P.* 324, 299,
300; 2 *Black on Judg. Secs.* 610, 611, 725; 1 *Chitty Pleading*, 478
(*note C.*) 604; *Freeman on Judg.* 252, 256, 257, 258, 259; 1 *Her-
man on Es.* 101, 102, 103, 104, 105, 106, 107.

The pleadings and record in the former case where it shows
the identity or want of identity of the two cases is conclusive; if
not, parol evidence is admissible.

*Smith's L. C.* (already cited); 1 *Herman Es.* 236, 251,
289, 290, 294.

Again, the plaintiff's rights under the contract in the former
case were divisible.   As many suits could be brought as there
were distinct breaches.   The Court at Washington so decided in
effect by giving damages for the breach alleged.

1 *Herman Es.* 244, 251; *Green vs. Clark*, 12 *N. Y.* 343;
*People vs. San Francisco*, 27 *Cal.* 655; *People vs. Johnson*, 38 *N·
Y.* 63; *Hadley vs. Albany*, 33 *N. Y.* 603.

The real test as to identity of issues is whether the same evi-
dence is necessary to sustain both actions.   The allegations in the
narrs conclusively show that the evidence to suppprt them is
necessarily and entirely different.

1 *Herman Es.* 96 ; *Freeman on Judg.* 259;   *Taylor vs.
Castle*, 42 *Cal.* 371; *Percy vs. Foot*, 36 *Conn.* 102.

The issues in these cases are as different as a declaration for a
breach of one contract and a declaration in debt on a bond for the
performance of another can make them.   On this general subject

there is much interesting law; hundreds of pages have been written and hundreds of cases have been cited.

And I desire to refer now to some of the more prominent cases.

*White vs. Smith*, 33 *Pa. St.* 186.—Two suits lease and guaranty.

*Orendorf vs. Utz*, 48 *Md.* 298.—Two breaches same contract.

*Robinson vs. Crowninshield*, 1 *N. H.* 76.—Divisible contract.

*Anderson vs. Schmitt*, 64 *Wis.* 664.—Two breaches on bond.

*Cromwell vs. Sac. Co.*, 94 *U. S.* 423, (bot. 197)—Must be identical question in both cases.

*McKensie vs. B. & O. R. R.*, 28 *Md.* 161.—Same parties and issues.

*Gray vs. Pingrey*, 17 *Vt.* 419, distinguishes estoppel from bar.

*Russell vs. Place*, 94 *U. S.* 606 (bot. 214).—Same point must clearly appear in first pleading.

*Aiken vs. Peck*, 22 *Vt.* 260.—The precise question must be clearly in issue; if any doubt no bar.

*Finn vs. Western R. R.*, 102 *Mass.* 283.—Syllabus.

*Ihmsen vs. Ormsby*, 32 *Pa. St.* 198.—Partition of lands not binding as to other land.

*Fulton vs. Smith*, 88 *Ind.* 149, 157.—Pleading in former case is the test of issue.

*Merchants Ins. Co. vs. Algeo*, 7 *Casey (Pa.)* 446.—Several suits on several breaches.

*Maloney vs. Horan*, 49 *N. Y.* 115;          To be concluded

*Brummell vs. Knight*, 51 *Barbour* 267; plaintiff must have been bound to include all matters, etc.

*Garwood vs. Garwood*, 29 *Cal.* 521; ⎧ Rule extends only to
*Hunter vs. Davis*, 19 *Georgia* 413; ⎨ facts and issue and
*King vs. Chase*, 15 *N. H.* 16. ⎩ not to collateral facts.

*Campbell vs. Consalys*, 25 *N. Y.* 613. This was a suit to compel satisfaction of a mortgage,—plea balance due,—judgment, that mortgage was not paid. *Held* this judgment was conclusive

between the parties as to the fact that the mortgage was not paid, but not conclusive as to the amount due thereon.

### INCIDENTAL RULES.

There can be no bar, unless the judgment was decided on its merits.

Where matter is ruled out as inadmissible under the pleading, the matter offered is not decided on its merits.

*Freeman on Judg. Sec.* 263; 2 *Smith L. C.* 808, 810,--already cited.

The burden of proof is on the defendant to show the identity of parties and the identity of issues, and it requires the utmost certainty of allegation and proof.   The record here offered clearly shows a want of such identity.

2 *Smith's L. C.* 812, 813,—already cited.

Therefore in conclusion it seems clear and conclusive that the record here offered in evidence shows that the suit and judgment in the former case, even if this suit were upon the same contract (*and a fortiori* when it is upon an entirely different instrument not even collateral to it) was,—

1.   Between different parties.

2.   On different causes of action, requiring different evidence to support them, from those in this case; and for these reasons is clearly inadmissible under the pleadings in this case.

(*Mr. Whiteman,* of counsel for defendants, replied, to the following effect):

*Mr. Whiteman:*—The offer of the foregoing record is supported by innumerable authorities:

1 *Herman on Estoppel and Res Judicata, Sec.* 218, *p.* 244; *ibid Sec.* 219, *p.* 246; *ibid Sec.* 220, *p.* 248; also the same authority, *Sec.* 223, *p.* 253; *Sec.* 265, *p.* 308; *Sec.* 287, *p.* 339; *Sec.* 458, *pp.* 551-552; *Sec.* 122, *p.* 130; *Sec.* 123, *p.* 131; *Sec.* 125, *p.* 133; *Sec.* 1270, *p.* 1420; *Sec.* 158, *p.* 168; *Sec.* 159, *p.* 170, and *Sec.* 160, *p.* 171.

See also *Master vs. Strickland,* 17 *S. & R.,* 354 (357-359);

*Drummond vs. Preston*, 12 *Wheat.*, 515 (519); *Webb vs. State* 44 *Tenn.*, 199 (202); *W illy vs. Faulk et al.*, 6 *Conn.*, 74; and other cases cited.

In respect to contracts, express or implied, each contract affords one and only one cause of action.

*Ency. of Pleading and Practice, p.* 151.

But where there are breaches of several and distinct covenants contained in the same instrument, all these breaches must be sued for together; while independent stipulations may be sued for as the breaches occur, all the breaches existing at the time the action is brought are only one cause of action.

*Ency. of Pleading and Practice*, 151.

When several claims, payable at different times, arise out of the same contract or transaction, separate actions can be brought as each liability accrues. Yet if no action is brought until more than one is due all that are due must be included in one action; and if an action is brought when more than one is due, a recovery in that suit will be an effectual bar to a second action brought to recover the other claims that were due when the first was brought.

*Ency. of Pleading and Practice*, 154, 155.

The following authorities sustain the foregoing propositions:

*Thompson vs. Myrick*, 24 *Minn.*, 4; *Hill vs. Joy*, 149 *Pa. State*, 243; *Liggett vs. Lippincott*, 50 *N. J. L.*, 462; *Jarret vs. Self*, 90 *N. C.*, 478; *Union R. R. and Traction Co. vs. Traube*, 59 *Mo.*, 355; *Kerr vs. Simmons*, 9 *Mo. App.*, 376; *Davis vs. Mayor*, 93 *N. Y.*, 250; *Bruen vs. Holme*, 2 *Barb.* 586; *Secor vs. Sturges*, 16 *N. Y.*, 548; *Enbury vs. Conner*, 3 *N. Y.*, 511; *Stevenson vs. Carey*, 29 *Wis.*, 34; *Rosenmeuller vs. Lampe*, 89 *Ill.* 212; *Trask vs. R. R. Co.*, 2 *Allen*, 331; *Crosby vs. Serolman*, 37 *Ind.*, 264; *Giffin vs. Wallace*, 66 *Ind.*, 410; *Reform Church vs. Brown*, 45 *Barb.*, 191; *Bonchard vs. Dias*, 3 *Denio*, 238; *Peterisne vs. Thomas*, 28 *Ohio St.*, 596; *Bagot vs. Williams*, 3 *B. & C.* 235; *Nichols vs. Dirrell*, 61 *Texas*, 539.

PENNEWILL, J:—If this suit could not be maintained against Jacoby, do you claim it could be maintained against the sureties, Mr. Cooper?

*Mr. Cooper:*—No sir; we do not claim that.

GRUBB, J.:—Suppose suit had been brought against Jacoby in this Court, to recover on the sub-contract and it had been held that the plaintiffs could not recover for wages and material, would not that conclude the question on a suit on the bond against the sureties?

*Mr. Cooper:*—If the Court should hold that that was a complete bar, I presume it would; but it is supposing a case which, in my view, does not exist here.

My contention is that we could bring a suit, as far as Mr. Jacoby personally is concerned, in this Court upon that individual and separate contract for the price of that material, and that the judgment at Washington upon the other breach would not be a bar.   Because the entity of the contract, if there is any entity, was for Messrs. Lanham and Brother to do certain work for a certain price.   That was a substantial part of the contract. The independent clause—which to my ·mind makes it clearly divisible—was that Mr. Jacoby should furnish them certain materials, lagging, etc. to do it.

GRUBB, J.:—Suppose we were to hold that it is an indivisible contract as to Jacoby, and therefore you should have sued him in the action in Washington, not only for damages for preventing plaintiffs from completing their contract, but should have included in the suit these matters as part of the issue, part of the case and part of the judgment; then would there be any necessity for going into the question as to whether the sureties were privies or not?

*Mr. Cooper:*—My reply to that is this:   That if the Court ignore the case in 2 *Harrington* and should say that this was a complete bar to this action, there is the end of our case.

PENNEWILL, J.:—The question is upon the admission of the record of the proceedings of the Supreme Court of the District of Columbia in evidence in this case.   The Court are unanimonsly of the opinion that the record is admissible, and it is therefore admitted.

We understand that the identity of the parties is admitted?

*Mr. Heisel:*—No sir; not the identity of parties.

PENNEWILL, J.:—That the plaintiffs in this case are the same persons as were plaintiffs in the suit brought in the Supreme Court of Washington?

*Mr. Heisel:*—Yes sir; that Calbreith B. Lanham and James C. Lanham, mentioned in this suit, are the same persons who were plaintiffs in the suit in Washington, and that John Jacoby in Wilmington was the same John Jacoby against whom this suit was originally brought and who afterwards dropped out of the proceedings.

*Mr. Cooper:*—I assume that the admission of this record in evidence includes the admission of all the necessary elements, by consent or otherwise; for instance, the existence of jurisdiction in the Supreme Court of the District of Columbia, the identity of persons and the identity of cause of action. Either of them failing, of course the Court would not have admitted this in evidence.

So that there is no use in offerring any further testimony.

PENNEWILL, J.:—All the Court do now is to admit the record in evidence.

*Mr. Cooper:*—That puts us at sea, in this way; that is, if your Honors admit it in evidence as a record of a former recovery between the same parties for the same cause of action, and it is a Court of competent jurisdiction, that is all right, and you would be admitting it in evidence under the plea as a bar to the present action. But if the Court should have any doubt with reference to any one of those elements of the record, you would say, "Gentlemen, we will not admit this until there is some original testimony to further convince our minds." That would be another matter.

If, however, you admit it in evidence under this plea, which is a plea in bar, that I take it would conclude the case, and you would direct the jury to return a verdict for the defendant.

PENNEWILL, J.:—We simply admit it in evidence. We do not say what the effect of that is.

*Mr. Cooper:*—We understand it is simply admitted in evi-

LANHAM AND BRO. vs. CARPENTER, et al. 449

ARGUMENTS.

dence for what it is worth, as we commonly say. Does that leave the door open to us to attack either of these elements of that record?—that is, not as to jurisdiction; we have admitted that, but as to parties or as to cause of action?

PENNEWILL, J.:—You say you admit what?

*Mr. Cooper:*—I mean this. It requires these three elements to go in evidence in order for the record to be a bar to this action. We have admitted that the Court was of competent jurisdiction. We have denied that they were the same parties or that it was the same cause of action. I understand your Honors have passed upon those two points and have concluded that they were the same parties and the same cause of action, and then admitted the record in evidence under the plea as a complete bar to the present cause of action. If that is true, that would end this case and the Court would direct the jury to return a verdict for the defendants. I want to know whether or not the door is open to us to attack it.

GRUBB, J.:—You have admitted that it was a Court of competent jurisdiction.

*Mr. Cooper:*—That is admitted.

GRUBB, J.:—You have also admitted that the individuals named as parties on both sides were the same individual persons?

*Mr. Cooper:*—Yes sir; that is, that John Jacoby, wherever it appears in this case, and Lanham and Brother, wherever they appear, are the same persons.

GRUBB, J.:—Whether they are the same parties or not is for the Court to decide.

*Mr. Cooper:*—That is right.

PENNEWILL, J.:—We understand it is admitted in this case that the Court before whom the case was tried in Washington had competent jurisdiction of the case. That is right, is it not?

*Mr. Heisel:*—Yes sir.

PENNEWILL, J.:—That is, that the plaintiffs in the case in Washington were the same persons who are named as plaintiffs in this case.

*Mr. Heisel:*—Yes sir.

PENNEWILL, J.: And that the defendant Jacoby, who was the defendant in the Washington case, is the same Jacoby who was named as one of the parties defendant in this case?

*Mr. Heisel:*—That is true.

PENNEWILL, J.:—Now is it admitted, or has it been shown, that the contract which was the cause of action in the Washington case is the same contract between Jacoby and the Lanhams which has been admitted in evidence in this case?

*Mr. Whiteman:*—Yes sir; and that is proven by the record. There is a copy in the record of that contract.

PENNEWILL, J.:—It may be the same, but have you connected it?

*Mr. Whiteman:*—Yes sir; that is admitted by these gentlemen.

PENNEWILL, J.:—Has it been shown, or is it admitted, that the contract which was the cause of action in the Washington case is the same contract between Jacoby and the Lanhams which has been admitted in evidence in this case?

*Mr. Prentiss:*—That is admitted by the pleadings. And then Lanham testified that he had executed no other contract on that day similar to this with Jacoby.

PENNEWILL, J.:—We cannot recollect all the testimony.

*Mr. Cooper:*—It is not admitted in the pleadings.

*Mr. Prentiss:*—That was Mr. Lanham's testimony, that he had executed no other contract except this one on that day.

*Mr. Heisel:*—That was said in the testimony.

*Mr. Whiteman:*—We gave him the name of the contract with the parties thereto and asked him if he ever executed any other contract with that party on that date, and he said he had not.

*Mr. Heisel:*—I do not dispute what Mr. Whiteman says that Mr. Lanham said on the stand. There is no agreement, however, about admitting the contract. Mr. Lanham said that, very near in the words that Mr. Whiteman says he used on the stand.

*Mr. Cooper:*—There was not a word, except as to the execution of the contract in evidence in this case; not a word said in the cross examination with reference to any suit in Washington, and

LANHAM AND BRO. vs. CARPENTER, et al.    451

ARGUMENTS.

that I am positive about, because we carefully avoided anything as to any suit in Washington.

Lore, C. J.:—Do you claim that there was another contract corresponding with, and executed for the same purpose as this? That is, the one in the record is of the same purport and tenor exactly as the one you put in evidence, Mr. Cooper. Don't you think there is enough there to put the burden on you to show that it is not the same.

*Mr. Cooper:*—I simply wanted to know from the Court as to the extent of it. Does that mean that we can attack the record?

Pennewill, J.:—With your admissions, what is there to attack?

*Mr. Cooper:*—The cause of action.

Pennewill, J.:—What do you mean?

*Mr. Cooper:*—That the causes of action are very different and that the parties at law are different, unless the Court say they are the same.

Grubb, J.:—Do you show by evidence, Mr. Whiteman, that the entire amounts for materials and labor were due at the time the action was brought?

*Mr. Whiteman:*—Yes sir; we showed by the evidence that it was on the 8th day of June.

Grubb, J.:—In other words, both causes of action—breaches for not furnishing the lagging, etc., as well as these claims for labor and materials?

*Mr. Whiteman:*—Yes sir—it was the 8th day of June; that is so, is it not, Mr. Cooper?

*Mr. Cooper:*—Yes; that is so; no doubt about that.

Lore, C. J.:—This record has been admitted. Have you anything to disprove that record—anything to offer in anyway? We want to know where you stand.

*Mr. Cooper:*—I really do not know without consulting with my client. The only thing I want to know is this—

LORE, C. J.:—(Interrupting)   You are asking us to state the effect of the admission of this testimony.

*Mr. Cooper:*—No sir; but only as to what shall be our course. Do I understand that the admission of this record by the Court concludes us from criticising the record in any way or manner we see fit before the jury, or offering any testimony that we see fit to offer upon it; or whether it is admitted as a complete bar to the suit.   If the Court have come to the conclusion that it is a complete bar to the suit, then we might as well stop right here.   We want to know what our course shall be.

LORE, C. J.:—How can we pass upon any attacks you may make upon this record, until we know how you propose to attack it.   We cannot launch into the future and anticipate something that we know nothing about.   What do you propose to offer?

*Mr. Cooper:*—Then I understand by that, that as the record now stands you consider it a bar to this action, and that we cannot criticise it before the jury?

PENNEWILL, J.:—If the contract, which was the basis of the cause of action in Washington, made between Jacoby and the Lanhams is the same contract which was offered in evidence here, then we say that the judgment obtained there is a bar to recovery here in this action.

*Mr. Cooper:*—That if the contract sued upon in Washington is the same contract offered in evidence here?

PENNEWILL, J.:—Yes; and the reason I say that is because you did not seem to be entirely agreed upon that.

*Mr. Cooper:*—As I understand the Court, if we are unable to show that the two contracts were different—the one in evidence and the one in Washington,—your Honors would say it is a complete bar to this action, and you would instruct the jury to find a verdict for the defendants.

PENNEWILL, J.:—Yes.

*Mr. Cooper:*—We are not prepared to prove that they are different contracts.   We have not the testimony here.

PENNEWILL, J.:—It appears from the evidence now that they

LANHAM AND BRO. vs. CARPENTER, et al.    453

CHARGE—VERDICT.

are the same, and unless you can rebut that, we must assume that they are the same.   You say you cannot rebut them?

*Mr. Cooper:*—No sir; we are not prepared now to rebut it.

GRUBB, J.:—Have you anything more to offer, Mr. Whiteman?

*Mr. Whiteman:*—We rest, on behalf of the defendants.

PENNEWILL, J.:—Have you anything in reply, Mr. Cooper?

*Mr. Cooper:*—We have nothing in reply, but we express our regrets that the Court take that view of it.

*Mr. Whiteman:*—Then I would ask the Court to instruct this jury to render a verdict for the defendants.

PENNEWILL, J.:—(charging the jury)

Gentlemen of the jury:   The Court instruct you in this case to return a verdict in favor of the defendants.

Verdict for defendants.